ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**22 CRIM 020**

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    -v-

ALEXANDER GULKAROV,
    a/k/a "Little Alex,"
ROMAN ISRAILOV,
    a/k/a "Roman Matatov,"
PETER KHAIMOV,
    a/k/a "Peter Khaim,"
ROBERT WISNICKI,
ANTHONY DIPIETRO,
ROLANDO CHUMACEIRO,
    a/k/a "Chuma,"
MARCELO QUIROGA, and
ALBERT ARONOV,

          Defendants.

:     <u>SEALED INDICTMENT</u>

:     22 Cr. (     )

- - - - - - - - - - - - - - - - - -X

### COUNT ONE
**(Conspiracy to Commit Healthcare Fraud)**

The Grand Jury Charges:

### Overview of the Scheme

1.    From at least in or about 2014 up to and including in or about 2021, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, ROBERT WISNICKI, ROLANDO CHUMACEIRO, a/k/a "Chuma," MARCELO QUIROGA, and ALBERT ARONOV, the defendants, and others known and unknown, were members and associates of a criminal enterprise (the "Gulkarov Organization" or the

"Organization") that exploited insurance programs designed to protect motor vehicle accident victims (the "No-Fault Scheme").

2.    As part of the No-Fault Scheme, the Gulkarov Organization fraudulently owned and controlled more than a dozen medical professional corporations – including medical, acupuncture, and chiropractic practices – by paying licensed medical professionals to use their licenses to incorporate the professional corporations (collectively, the "No-Fault Clinics" or the "Clinics"). The Gulkarov Organization defrauded automobile insurance companies by billing insurance companies for unnecessary and excessive medical treatments, and lying under oath to insurance company representatives.

3.    The Gulkarov Organization further promoted the scheme through bribery. The Gulkarov Organization paid hundreds of thousands of dollars to co-conspirators (the "Runners"), who used this money to bribe 911 operators, hospital employees, and others (collectively, the "lead sources") for confidential motor vehicle accident victim information.  The Runners then used this information to contact automobile accident victims, lie to them, and induce them to seek medical treatment at, among other places, the No-Fault Clinics.

4.    The Gulkarov Organization laundered the proceeds of the fraud scheme through law firms, check-cashing entities, and shell companies, and used the money to pay for luxury cars,

watches, and vacations. Then, when members of the Gulkarov Organization learned that they were under federal criminal investigation, they obstructed justice by fabricating documents, lying to law enforcement, and committing perjury before a federal grand jury.

5.   All told, the Gulkarov Organization billed insurance companies for more than $30 million in fraudulent medical treatments.

### Overview of No-Fault Motor Vehicle Insurance

6.   At all times relevant to this Indictment, New York State Law required every vehicle registered in New York State to have no-fault automobile insurance, which enabled the driver and passengers of a vehicle registered and insured in New York State to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of fault (the "No-Fault Law"). The No-Fault Law required payments for medical treatments to be made promptly, thereby obviating the need for vehicle occupants (the "Patients") to file personal injury lawsuits in order to be reimbursed for medical treatment. Under the No-Fault Law, the Patients could assign their right to reimbursement from an insurance company to others, including, but not limited to, medical clinics that provided medical services to treat their injuries. If such an assignment were made, the medical clinics, or their agents, would bill the

3

insurance company directly for services rendered and would receive payments directly from the insurance company. Typically, insurance companies compensate the medical practitioners at a fixed rate for various medical services performed on these accident victims. In order to obtain damages separate and apart from the $50,000 allowed by the No-Fault Law, a Patient could file a personal injury claim and/or lawsuit in order to show that the occupant sustained a "serious injury," as defined by New York State Law, as a result of the accident.

7.   At all times relevant to this Indictment, pursuant to New York State Law, all medical clinics in New York State must have been incorporated, owned, operated, and/or controlled by a licensed medical practitioner in order to be eligible for reimbursement under the No-Fault Law. Insurance companies would deny all billings for medical treatments from a medical clinic that was not actually owned, operated, and controlled by a licensed medical practitioner.

## Entities and Individuals Involved in the Scheme

8.   **The Clinic Controllers:** ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," and ANTHONY DIPIETRO, the defendants, were the leaders, organizers, and managers of the Gulkarov Organization and the No-Fault Scheme. The Clinic Controllers -- who are not licensed medical practitioners -- owned, operated, and controlled the No-

Fault Clinics that engaged in the fraudulent billing for unnecessary and excessive medical treatment under the No-Fault Law. The Clinic Controllers also engaged in multiple types of money laundering to conceal the proceeds of those crimes and financed a widespread bribery and kickback scheme to bring patients into the Clinics.

9.    **The No-Fault Physicians:** The No-Fault Physicians are nearly a dozen licensed medical practitioners -- including doctors, acupuncturists, and chiropractors -- who ceded control of their medical practices to the Clinic Controllers and engaged in unnecessary and excessive medical treatments. ROLANDO CHUMACEIRO, a/k/a "Chuma," the defendant, is a licensed medical doctor who incorporated the medical clinic, Smart Choice Medical PC, as part of the scheme. MARCELO QUIROGA, the defendant, is a licensed chiropractor who incorporated two chiropractic corporations, Southern Boulevard Chiropractic PC and Comfort Choice Chiropractic PC, as part of the scheme. Both CHUMACEIRO and QUIROGA prescribed unnecessary and excessive medical treatments and overbilled insurance companies under the No-Fault Law.

10.    **The Collections Attorney:** The Collections Attorney represents the No-Fault Physicians in arbitration, litigation, and sworn depositions before insurance companies. The Collections Attorney profited by taking a percentage of any

money recovered from insurance companies that denied payments for medical claims submitted by the No-Fault Clinics. In order to conceal and promote the scheme, the Clinic Controllers and the Collections Attorney coached the No-Fault Physicians to lie under oath to insurance companies about the necessity of medical procedures and the Clinic Controllers' control of the No-Fault Clinics.

11.     **The Money Launderers:** The Money Launderers include over two dozen persons and entities whose role was to conceal and promote the healthcare fraud scheme. These persons include ROBERT WISNICKI, the defendant, who is the founding attorney of the New York-based law firms, Wisnicki and Associates LLP, and Wisnicki Neuhauser LLP (collectively, the "Wisnicki Firm"). The Clinic Controllers transferred hundreds of thousands of dollars of illegal proceeds from the No-Fault Clinics to the Wisnicki Firm under the false pretense that the payments were for legal services. WISNICKI thereafter paid family members of the Clinic Controllers or purchased real estate on behalf of family members of the Clinic Controllers. WISNICKI then sought to conceal the money laundering by fabricating retainer agreements with the No-Fault Physicians, lying to law enforcement, and committing perjury in a federal grand jury.

12. **The New York City Police Department ("NYPD")**

**Officer:** The NYPD Officer was responsible for stealing

confidential patient information from the NYPD's servers. As

part of the scheme, ALBERT ARONOV, the defendant, logged into

NYPD computers during off-hours and searched for confidential

motor vehicle accident reports on the NYPD's servers. ARONOV

partially covered the computer screens with pieces of paper to

conceal that the reports came from NYPD servers and took photos

of the reports using a pre-paid "burner" phone. ARONOV

transmitted the photos to the Clinic Controllers using an

encrypted messaging application. The Clinic Controllers and

associates of the Gulkarov Organization then used the

confidential information inside these reports to contact the

motor vehicle accident victims, lie to them, and steer them to

the No-Fault Clinics for medical treatment. ARONOV later lied

about his accessing and dissemination of confidential motor

vehicle accident reports when questioned by federal agents.

### Means and Methods of the No-Fault Scheme

13. The co-conspirators used various means and

methods to carry out the scheme.

### The Fraudulent No-Fault Clinics

14. In order to take advantage of the patient-

friendly provisions of the No-Fault Law, the Clinic Controllers

recruited over half a dozen medical practitioners – including

7

medical doctors, chiropractors, and acupuncturists – to open the No-Fault Clinics between in or about 2014 up to and including in or about 2021.

15.   While purporting to be legitimate medical care clinics specializing in treating patients, the No-Fault Clinics were not owned, operated, and controlled by licensed medical practitioners. Instead, the Clinic Controllers were the actual owners, operators, and controllers of Clinics. For instance, the Clinic Controllers took upwards of 90% of the No-Fault Clinics' proceeds; possessed the checkbooks for the Clinics' bank accounts; caused the No-Fault Physicians to pre-sign hundreds of blank checks from these accounts; controlled the debit and credit cards for the Clinics; possessed signature stamps bearing the No-Fault Physicians' signatures; controlled hiring and firing of the Clinics' employees; invested the initial funds to establish the No-Fault Clinics; controlled where to open new Clinics; negotiated the rent for the Clinics' leases; sourced and paid for the Clinics' equipment; created the bills that were sent to the insurance companies; and chose the attorneys who would represent the No-Fault Physicians in arbitration, litigation, and sworn depositions before insurance companies.

16.   The Clinic Controllers further caused the No-Fault Physicians to routinely bill automobile insurance companies for medical treatments that were either (i) never

provided, (ii) unnecessary or excessive because the Patients did not medically need the treatments; and/or (iii) more serious treatments than the Patients actually received.

17. When a patient arrived for treatment at the No-Fault Clinics, the patient was usually evaluated by a No-Fault Physician, who recommended an almost identical schedule of treatments for every patient. This schedule of treatments included physical therapy, chiropractory, and acupuncture. Nearly every time a patient went to a No-Fault Clinic, the patient received all three of these treatments. In addition, the No-Fault Physicians prescribed prescription drugs that were medically unnecessary given the degree of the Patients' injuries; durable medical equipment ("DME") that was not tailored to the Patients' injuries; and medical resonance imagings ("MRIs") for areas of the body that lacked a clinical indication of injury. The No-Fault Physicians further prescribed painful and unnecessary electrodiagnostic testing including electromyography ("EMG") and nerve conduction velocity ("NCV") testing. In legitimate medical practices, physicians use EMG and NCV testing to detect neuromuscular abnormalities and nerve damage by inserting needles into the arms and legs to measure electrical activity. The No-Fault Physicians, however, abused the procedures by routinely prescribing EMG and NCV testing to

patients who lacked clinical indications of neuromuscular injuries.

18.   The Clinic Controllers profited every step of the way. In addition to receiving upwards of 90% of the proceeds of the No-Fault Clinics, the Clinic Controllers owned the billing company that filed the No-Fault Physicians' medically unnecessary claims (the "No-Fault Billing Company") and the pharmacies that filled the No-Fault Physicians' medically unnecessary prescriptions (the "No-Fault Pharmacies"). The No-Fault Physicians did not have a choice in which billing company or pharmacies they could use. The Clinic Controllers required them to use the No-Fault Billing Company and No-Fault Pharmacies as part of the scheme.

## Use of The Collections Attorney

19.   The Clinic Controllers further arranged for the No-Fault Physicians to lie under oath to insurance companies. Under the No-Fault Law, insurance carriers have the right to subject medical providers to Examinations under Oath ("EUOs") when the carriers suspect that providers have submitted fraudulent claims. During the process, the physician is sworn in under oath and asked questions relevant to the claim at hand, including whether their medical practice is under the control of nonphysicians.

20.   The Clinic Controllers required the No-Fault Physicians to employ the Collections Attorney and his law firm to represent the No-Fault Physicians in EUOs. The Clinic Controllers, No-Fault Physicians, and the Collections Attorney were aware that insurance companies would deny reimbursement for the No-Fault Clinics if the No-Fault Physicians testified truthfully about the medical necessity of treatments and the Clinic Controllers' control of the Clinics. The Clinic Controllers and the Collections Attorney accordingly arranged for the No-Fault Physicians to falsely state under oath, among other things:

a.   The Clinic Controllers did not assist the No-Fault Physicians in incorporating the No-Fault Clinics;

b.   The No-Fault Physicians controlled the checkbooks, debit cards, and credit cards of the No-Fault Clinics;

c.   The No-Fault Physicians controlled the distribution of all the proceeds from the No-Fault Clinics' bank accounts; and

d.   Payments from the No-Fault Clinics' bank accounts to the Clinic Controllers were for "consulting," "advertising," "marketing," and "transportation."

21.   The Collections Attorney profited from this illegal arrangement in multiple ways. As an initial matter, the

11

Clinic Controllers paid the Collections Attorney for his time representing the No-Fault Physicians in EUOs. The Clinic Controllers also required the No-Fault Physicians to retain the Collections Attorney's firm to sue insurance companies that denied payments to the No-Fault Clinics. The Collections Attorney and his firm then took a percentage of any money recovered from arbitration and litigation.

22.   The Collections Attorney and ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant, spoke openly about the fact that they were committing fraud. For instance, in or about 2020, GULKAROV proposed to the Collections Attorney that they should cease billing insurance companies under the No-Fault Law because the companies were refusing to pay. Instead, GULKAROV proposed that they solely treat victims receiving insurance benefits under the federal government's Medicaid program. The Collections Attorney responded: "Then next stop is jail."

<u>Money Laundering</u>

23.   The Gulkarov Organization laundered the proceeds of the No-Fault Scheme to conceal the operation. The Clinic Controllers could not transfer the proceeds of the No-Fault Scheme directly from the No-Fault Clinics' bank accounts to their personal accounts because insurance companies typically required the No-Fault Physicians to turn over several months of bank statements during EUOs, and direct transfers would have

exposed the Clinic Controllers' illegal involvement. Instead, the Clinic Controllers caused the No-Fault Physicians to conduct several different types of financial transactions designed to maintain, promote, and conceal the illegal operation.

24.   Among other things, the Clinic Controllers required the No-Fault Physicians to pay fees to companies that the Clinic Controllers owned and controlled. The Clinics Controllers used these fees -- such as "marketing," "billing," and "rent" -- to make their relationship with the No-Fault Clinics appear legitimate. In reality, the fees were non-negotiable, illegal, and excessive. For instance, some of these fees, such as "marketing," were ultimately used to pay bribes to fill the No-Fault Clinics with patients. Other fees, such as "rent" and "billing," far exceeded the market value of these alleged services.

25.   The Clinic Controllers further required the No-Fault Physicians to turn over the No-Fault Clinics' debit cards and credit cards and pre-sign thousands of blank checks from the No-Fault Clinics' bank accounts (the "Pre-Signed Checks"). The Clinic Controllers used the debit cards, credit cards, and Pre-Signed Checks to transfer money out of the No-Fault Clinics' accounts in several different ways:

a.   To pay for the personal expenses of members and associates of the Clinic Controllers, including home

renovation and construction, mortgages, car leases, domestic and international travel, banquets, and luxury goods.

        b.   To pay shell companies controlled by members and associates of the Clinic Controllers (the "Shell Companies"). The Shell Companies had no legitimate business or employees. However, the Shell Companies typically had names designed to create the false impression that they were involved in the practice of medicine, marketing, consulting, or transportation. After the proceeds of the healthcare fraud scheme were deposited into the Shell Companies' bank accounts, the Clinic Controllers caused most of the proceeds to be withdrawn in cash in amounts less than $10,000 to avoid financial reporting requirements.

        c.   To pay for real estate transactions conducted by ROBERT WISNICKI, the defendant, and the Wisnicki Firm. Between approximately 2016 and 2017, the Clinic Controllers made over $150,000 in payments to WISNICKI using the Pre-Signed Checks. WISNICKI thereafter paid family members of the Clinic Controllers or purchased real estate on behalf of family members of the Clinic Controllers.

<u>Bribery</u>

        26.   The No-Fault Scheme depended on the No-Fault Clinics and Pharmacies receiving a steady stream of motor vehicle accident victims. The Clinic Controllers paid bribes to

ensure that such victims sought treatment at the No-Fault
Clinics.

27.   The Clinic Controllers arranged for the Runners
to pay hundreds of thousands of dollars to the lead sources
(*i.e.*, employees or agents of hospitals, medical service
providers, police officers and 911 operators employed by the
NYPD, and other entities). These lead sources, in turn,
unlawfully disclosed the protected, confidential information of
tens of thousands of motor vehicle accident victims in New York,
New Jersey, and elsewhere.

28.   After obtaining the confidential information of
motor vehicle accident victims -- which often included victims'
names, contact information, and medical information -- the
Runners contacted the victims and made false representations,
including that the associates were calling on behalf of the New
York State Department of Transportation. The Runners made these
false representations to steer the victims to receive medical
treatment from a select "network" of clinics and lawyers in New
York, New Jersey, and elsewhere, including the No-Fault Clinics
and lawyers that were a part of the Gulkarov Organization.

29.   The Clinic Controllers paid the Runners
approximately $1,500 to $3,000 per successful "referral." The
Runners then took a portion of the kickbacks for themselves and

funneled the rest of the money to the lead sources that provided the confidential information.

30.   As part of the scheme, the Clinic Controllers also paid cash bribes to the No-Fault Physicians and practitioners at other no-fault clinics to prescribe medically unnecessary, topical compound creams from the No-Fault Pharmacies.

Obstruction of Justice

31.   Certain members of the Gulkarov Organization engaged in obstruction of justice in an attempt to conceal the No Fault Scheme.

32.   The Gulkarov Organization and ROBERT WISNICKI, the defendant, laundered the proceeds of the No Fault Scheme by transferring hundreds of thousands of dollars to the Wisnicki Firm under the false pretense that the payments were for legal services.

33.   In or about April 2021, the Wisnicki Firm was served with a subpoena from a grand jury sitting in the Southern District of New York (the "Subpoena").  Among other things, the Subpoena required the Wisnicki Firm to produce documentation concerning the payments from the No-Fault Clinics to the Wisnicki Firm. In response, ALEXANDER GULKAROV, a/k/a "Little Alex," ANTHONY DIPIETRO, and ROBERT WISNICKI, the defendants, agreed to submit fabricated documents to the grand jury, lie in

16

communications with the United States Attorney's Office for the Southern District of New York (the "United States Attorney's Office"), and commit perjury before the grand jury.

34. On or about April 19, 2021, ROBERT WISNICKI, the defendant, submitted to the grand jury over a dozen phony retainer agreements between the Wisnicki Firm, the No-Fault Physicians, and the No-Fault Clinic Controllers. The agreements were unsigned and contained no description of the Wisnicki Firm's proposed engagements. The same day, WISNICKI falsely stated to the United States Attorney's Office that the funds paid to the Wisnicki Firm "were originally supposed to be used for a [sic] retainer fees, which is why the agreements were originally prepared," but that their clients ultimately "instead asked us to hold the funds to be used for future investments." WISNICKI further represented that the Wisnicki Firm only decided to return the retainer fees after receiving the Subpoena – years after the payments were made.

35. The day next day, on or about April 20, 2021, ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant, contacted one of the No-Fault Physicians ("Physician-1") and stated, in sum and substance, that ROBERT WISNICKI, the defendant, had received a grand jury subpoena for documents and that WISNICKI had told the Government that the payments were retainer fees for legal services. GULKAROV then pulled out a

17

stack of retainer agreements – identical to those provided to the United States Attorney's Office -- and handed Physician-1 an agreement from the Wisnicki Firm dated October 2017 with Physician-1's name on it. Physician-1 had never seen the retainer agreement before. GULKAROV instructed Physician-1 to sign the retainer agreement but not to date it.

36.  Approximately nine days later, on or about April 29, 2021, ANTHONY DIPIETRO, the defendant, met with Physician-1. The meeting was audio and video recorded. DIPIETRO told Physician-1, in sum and substance, to turn off his/her phone and leave it in his/her vehicle. DIPIETRO then stated, in sum and substance, that he did not understand why the "Feds" were involved because this was not a hundred-million-dollar operation. DIPIETRO then handed Physician-1 a handwritten letter from ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant, which stated that Physician-1 should deposit the money from the Wisnicki Firm, withdraw the funds, and give them to GULKAROV. DIPIETRO then tore up the letter and handed Physician-1 a check from the Wisnicki Firm.

37.  Approximately one month later, in or about June 2021, Physician-1 deposited the check from the Wisnicki Firm given to him by ANTHONY DIPIETRO, the defendant, withdrew the funds in a money order made out to the Wisnicki Firm, and

provided the money order to ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant.

38.  Shortly thereafter, on or about July 6, 2021, ROBERT WISNICKI, the defendant, appeared before the grand jury as custodian of record for the Wisnicki Firm. WISNICKI falsely stated, among other things, that payments to the Wisnicki Firm were for the purpose of opening a "lending platform" that was never completed, that WISNICKI had not spoken to anyone outside of the Wisnicki Firm about the Subpoena, and that WISNICKI's law partner was involved in preparing the retainer agreements.

<u>False Statements to Law Enforcement</u>

39.  To further conceal the No-Fault Scheme, certain members of the Gulkarov Organization made false statements to law enforcement. On or about November 19, 2021, federal law enforcement agents approached ALBERT ARONOV, the defendant, to interview him about his role in the Gulkarov Organization. ARONOV initially falsely stated that he did not recognize the name of ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant. ARONOV then acknowledged that he knew GULKAROV, but falsely denied ever sending GULKAROV any NYPD information or looking up any NYPD information for GULKAROV.

<u>Statutory Allegations</u>

40.  From at least in or about 2014, up to and including in or about 2021, in the Southern District of New York

19

and elsewhere, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, ROBERT WISNICKI, ROLANDO CHUMACEIRO, a/k/a "Chuma," and MARCELO QUIROGA, the defendants, and others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit health care fraud, in violation of Title 18, United States Code, Section 1347.

41.  It was a part and an object of the conspiracy that ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, ROBERT WISNICKI, ROLANDO CHUMACEIRO, a/k/a "Chuma," and MARCELO QUIROGA, the defendants, and others known and unknown, knowingly and willfully, would and did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items and services.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

42.  The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

43.  From at least in or about 2014, up to and including in or about 2021, in the Southern District of New York and elsewhere, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, and ROBERT WISNICKI, the defendants, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(1)(B)(ii).

44.  It was a part and an object of the conspiracy that ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, and ROBERT WISNICKI, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit the health care fraud offense charged in Count One of this Indictment, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the

specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

45.   It was further a part and an object of the conspiracy that ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, and ROBERT WISNICKI, and others known and unknown, knowing that the property involved in certain financial transactions represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of specified unlawful activity, to wit the health care fraud offense charged in Count One of this Indictment, knowing that the transactions were designed in whole or in part to avoid a transaction reporting requirement under State or Federal law, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(ii).

(Title 18, United States Code, Section 1956(h).)

### COUNT THREE
**(Conspiracy to Commit Travel Act Bribery)**

The Grand Jury further charges:

46.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

47.   From at least in or about 2015, up to and including in or about November 2019, in the Southern District of

New York and elsewhere, ALEXANDER GULKAROV, a/k/a "Little Alex,"
ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," and ANTHONY
DIPIETRO, the defendants, and others known and unknown,
knowingly and willfully combined, conspired, confederated, and
agreed together and with each other to commit an offense against
the United States, to wit, a violation of the Travel Act, in
violation of Title 18, United States Code, Sections 1952 and
371.

48.  It was a part and an object of the conspiracy
that ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV,
and PETER KHAIMOV, a/k/a "Peter Khaim," the defendants, and
others known and unknown, knowingly did travel in interstate and
foreign commerce and did use the mail and a facility in
interstate and foreign commerce, with the intent to promote,
manage, establish, carry on, and facilitate the promotion,
management, establishment, and carrying on of an unlawful
activity, to wit, a bribery scheme in violation of New York
Penal Law §§ 180.05, 200.00, and 200.10 and New Jersey Revised
Statutes § 2C:27-2, among others, whereby employees or agents of
hospitals, the NYPD, emergency medical services, and other
entities disclosed protected, confidential information of tens
of thousands of motor vehicle accident victims in New York, New
Jersey, and elsewhere in exchange for payment, and thereafter
performed and attempted to perform acts to promote, manage,

establish, and carry on, and to facilitate the promotion, management, and carrying on of such unlawful activity.

49.   It was further a part and an object of the conspiracy that ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," and ANTHONY DIPIETRO, the defendants, and others known and unknown, knowingly did travel in interstate and foreign commerce and did use the mail and a facility in interstate and foreign commerce, with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of an unlawful activity, to wit, a bribery scheme in violation of New York Penal Law §§ 180.05, among others, whereby ISRAILOV, DIPIETRO, and KHAIMOV paid medical practitioners, without the authorization of their patients or employers, in return for the medical practitioners' sending patient prescriptions to the No-Fault Pharmacies, and thereafter performed and attempted to perform acts to promote, manage, establish, and carry on, and to facilitate the promotion, management, and carrying on of such unlawful activity.

## Overt Acts

50.   In furtherance of said conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

       a.   In or about 2015, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, and PETER KHAIMOV, a/k/a "Peter Khaim," the defendants, supplied a Runner ("Runner-1") approximately $200,000 so that Runner-1 could establish a call center to contact motor vehicle accident victims and steer them to the No-Fault Clinics for medical treatment.

       b.   On or about March 16, 2017, ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant, contacted Runner-1 and asked, in sum and substance, how many motor vehicle accident victims Runner-1 had sent to the No-Fault Clinics that month.

       c.   From in or about 2014 to in or about 2016, ROMAN ISRAILOV, the defendant, paid a No-Fault Physician ("Physician-2") without the consent of Physician-2's patients in return for Physician-2's prescribing medically unnecessary compound creams and sending them to the No-Fault Pharmacies to be filled.

       d.   From in or about 2016 to in or about 2017, ANTHONY DIPIETRO, the defendant, paid Physician-1 without the consent of Physician-1's patients or employer in return for Physician-1 causing physicians located in the Bronx and White Plains to use the No-Fault Pharmacies to fill prescriptions for compound creams.

       e.   On or about February 19, 2017, PETER KHAIMOV, a/k/a "Peter Khaim," the defendant, called the manager

25

of a New-York based clinic and stated, in sum and substance, that he would put the manager on "retainer" if the manager provided the No-Fault Pharmacies prescriptions for "pharmacy work" and "supplies" from the manager's clinic.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Conspiracy to Obstruct Justice)

The Grand Jury further charges:

51.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

52.   From at least in or about April 2021 up to and including July 2021, ALEXANDER GULKAROV, a/k/a "Little Alex," ANTHONY DIPIETRO, and ROBERT WISNICKI, the defendants, together with others known and unknown, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, obstruction of justice, in violation of Title 18, United States Code, Section 1503.

53.   It was a part and an object of the conspiracy that ALEXANDER GULKAROV, a/k/a "Little Alex," ANTHONY DIPIETRO, and ROBERT WISNICKI, the defendants, together with others known and unknown, knowingly and willfully, would and did corruptly

influence, obstruct, or impede, or endeavor to influence, obstruct, or impede, the due administration of justice.

### Overt Acts

54.    In furtherance of said conspiracy and to effect its illegal object, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.    On or about April 20, 2021, ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant, met with Physician-1 and caused Physician-1 to sign a phony, backdated retainer agreement with the Wisnicki Firm.

b.    On or about April 29, 2021, ANTHONY DIPIETRO, the defendant, met with Physician-1, provided him/her with a check from the Wisnicki Firm for phony retainer fees, and instructed Physician-1 to deposit the funds and return them to GULKAROV.

c.    On or about July 6, 2021, ROBERT WISNICKI, the defendant, falsely stated under penalty of perjury before a federal grand jury, among other things, that payments to the Wisnicki Firm were for the purpose of opening a "lending platform" that was never completed, that WISNICKI had not spoken to anyone outside of the Wisnicki Firm about the Subpoena, and that WISNICKI's law partner was involved in preparing the retainer agreements.

(Title 18, United States Code, Section 371.)

## COUNT FIVE
### (False Statements)

The Grand Jury further charges:

55.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

56.   On or about November 19, 2021, in the Southern District of New York and elsewhere, ALBERT ARONOV, the defendant, in a matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully did make materially false, fictitious, and fraudulent statements and representations, to wit, ARONOV, after being told that making false statements to federal law enforcement is a crime, falsely stated to federal law enforcement officers, among other things, that:

a.   ARONOV he never took photos of confidential motor vehicle accident reports located on the NYPD's servers; and

b.   ARONOV and never transmitted said photos to ALEXANDER GULKAROV, a/k/a "Little Alex," the defendant.

(Title 18, United States Code, Sections 1001 and 2.)

## COUNT SIX
### (AGGRAVATED IDENTITY THEFT)

The Grand Jury further charges:

57.   The allegations set forth in paragraphs 1 through 39 of this Indictment are repeated and realleged as if fully set forth herein.

58.   From at least in or about 2015 up to and including in or about 2019, in the Southern District of New York and elsewhere, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, and PETER KHAIMOV, a/k/a "Peter Khaim," the defendants, together with others known and unknown, knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation enumerated in Title 18, United States Code, Section 1028A(c), to wit, GULKAROV, ISRAILOV, and KHAIMOV, during and in relation to the health care fraud offense charged in Count One of this Indictment, caused Runners to bribe 911 operators, hospital employees, and others for the names and phone numbers of actual motor vehicle accident victims and use these unlawfully acquired means of identification to induce victims to seek medical treatment from the No-Fault Clinics.

(Title 18, United States Code, Section 1028A.)

### Forfeiture Allegation as to Count One
### (Conspiracy to Commit Healthcare Fraud)

59.   As a result of committing the offense charged in Count One of this Indictment, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim,"

ANTHONY DIPIETRO, ROBERT WISNICKI, ROLANDO CHUMACEIRO, a/k/a "Chuma," and MARCELO QUIROGA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Forfeiture Allegation as to Count Two
### (Conspiracy to Commit Money Laundering)

60.   As a result of committing the money laundering offense charged in Count Two of this Indictment, ALEXANDER GULKAROV, a/k/a "Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," ANTHONY DIPIETRO, and ROBERT WISNICKI, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

### Forfeiture Allegation as to Count Three
### (Conspiracy to Commit Travel Act Bribery)

61.   As a result of committing the offense alleged in Count Three of this Indictment, ALEXANDER GULKAROV, a/k/a

"Little Alex," ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter Khaim," and ANTHONY DIPIETRO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

<u>Substitute Asset Provision</u>

62. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

31

it is the intention of the United States, pursuant to Title 21,

United States Code, Section 853(p) and Title 28, United States

Code, Section 2461(c), to seek forfeiture of any other property

of the defendants up to the value of the forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

---

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

### UNITED STATES OF AMERICA

v.

**ALEXANDER GULKAROV, a/k/a "Little Alex,"
ROMAN ISRAILOV, PETER KHAIMOV, a/k/a "Peter
Khaim," ANTHONY DIPIETRO, ROBERT WISNICKI,
ROLANDO CHUMACEIRO, a/k/a "Chuma," MARCELO
QUIROGA, and ALBERT ARONOV,**

**Defendants.**

---

### SEALED INDICTMENT

22 Cr.

(18 U.S.C. §§ 371, 1001, 1028A, 1349,
1956 and 2)

DAMIAN WILLIAMS
United States Attorney

FOREPERSON

33