**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )   S4 22 Cr. 20 (PGG) |
| ROBERT WISNICKI, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**
**OF ROBERT WISNICKI**

This Sentencing Memorandum is respectfully submitted on behalf of defendant Robert Wisnicki, who is scheduled to be sentenced on February 15, 2024. For the reasons set forth below, the Court should impose a most lenient sentence.

**PRELIMINARY STATEMENT**

Robert Wisnicki will appear before this Court for sentencing, a 45-year-old man, broken, chastened and humbled. "Dovi," as he is known to friends and family, accepts full responsibility for his offenses. He is profoundly remorseful for violating the law and abusing the trust that clients, colleagues, and the New York and federal bars placed in him as an attorney. He recognizes that his false testimony during the course of an investigation renders him even more blameworthy than most defendants. He is deeply ashamed of, and apologetic for, his conduct.

Dovi loved being a lawyer. As a result of his crimes, he lost his law license, his business, and his sense of professional worth. It is highly unlikely that he will ever be able to practice law again. He is prepared to endure only because he is supported by, and wholly devoted to, his five children, his loving wife, his extended family and his many friends. With their support, he is

prepared to spend the remainder of his days focused on repaying the losses that he caused. His

wife, Yonina, puts it squarely:

> Dovi wants nothing more than to be able to pay everyone back and tries to find
> more and more work to be able to do so. I see the pain in his eyes of what he has
> caused and who he has hurt. He doesn't live a single day without regret and wishes
> he can go back and make better decisions and do things differently.

(Ex. A-169).

Dovi is much more than the one-dimensional figure described in the charging documents.

He is "a humble, kind and sweet person who dedicates his life to his family and community."

(Ex. A-82). Dovi has led a low-key life, centered around his close-knit and loving family. He

never sought "social status," prominence or a life of luxury. His crimes were not motivated by

nastiness, spite or ill will toward others. In fact, he is respected—even today, and even by some

of the people he victimized—for his faith, his modesty, his decency and his generosity of spirit.

He is a gentle and kind soul. We respectfully submit that his punishment should be mitigated by

the years of quality service he provided to clients and community, even as he betrayed the values

he learned from his parents and shared with his own children. He is tortured every day by his

misdeeds and the pain he caused.

Dovi respects the advisory Sentencing Guidelines stipulations and calculations in the Plea

Agreement. Nothing set forth herein should be taken to the contrary. This Memorandum is

intended solely to help the Court fashion a sentence that is "sufficient, but not greater than

necessary" to achieve the goals enumerated in 18 U.S.C. § 3553(a)(2).

## THE OFFENSE CONDUCT

The original Indictment in this case, as pertinent here, charged Dovi and four others with

conspiracy to commit money laundering, and Dovi and two others with conspiracy to obstruct

justice. ECF No. 1 (Indictment), at ¶¶ 43, 52. Four months after the indictment, Dovi, then a

practicing attorney, voluntarily made a proffer to the government.  In the proffer session, he

freely and "truthfully admitted to his participation in the money laundering offense[,]" as well as

the related obstructive conduct, "for which he had already been charged."  Plea Agreement at 11.

Dovi also, in the proffer session, voluntarily admitted conduct about which the

government had no prior knowledge—his mishandling of monies in his attorney trust accounts—

that now forms the basis for the wire fraud offense on which he will appear for sentencing.  That

misconduct was more serious under the Sentencing Guidelines than the money-laundering

conduct the government had investigated.

Within days of the proffer, and further demonstrating his recognition of wrongdoing and

acceptance of responsibility, Dovi voluntarily submitted his resignation from the bar.  The

Appellate Division, Second Department, later accepted that resignation and entered an order of

disbarment.

*       *       *

Count One of the Superseding Information charged conspiracy to commit money

laundering.  Dovi pleaded guilty, and admitted the following:

> (1) Wisnicki was the founding attorney of the New York-based law firms,
> Wisnicki and Associates LLP, and Wisnicki Neuhauser LLP (collectively, the
> "Wisnicki Firm").  In or about 2016 and 2017, unindicted co-conspirator 1 ("CC-
> 1"), using checks, transferred monies from the No-Fault Clinics, as defined in the
> Indictment, to the Wisnicki Firm.  Wisnicki deposited the checks into one of his
> Interest Only Lawyers Accounts ("IOLA").

Plea Agreement at 10.  The checks described above totaled $210,548.06, *id.* at 2, a tiny fraction

of the proceeds of the health-care fraud charged in the original Indictment.  *See* ECF No. 1

(Indictment) at 5 (charging "more than $30 million in fraudulent medical treatments"); U.S.

Attorney's Office November 3, 2023 Press Release (describing health-care fraud scheme that

"resulted in over $40 million in losses"), available at: https://www.justice.gov/usao-

sdny/pr/queens-man-pleads-guilty-co-leading-one-largest-no-fault-insurance-frauds-new-york.

At his plea allocution, Mr. Wisnicki clarified, with respect to his knowledge, that when he

received and deposited the checks described above, he had no specific knowledge of the health-

care fraud charged in the original Indictment.

> THE COURT: . . . Mr. Wisnicki, you mentioned that you understood that the, I think you said you learned from a client that the monies were, I think you said, from unlawful activity. Did you understand them to be the proceeds of healthcare fraud?

> THE DEFENDANT: I was unaware of what kind of unlawful activity at that time.

> THE COURT: All right. What's the government's view about the adequacy of the plea on that point?

> MR. ANDREWS: Judge, the statute Section 1956 specifically states that for the purposes of mens rea, the defendant does not have to know what specific type of unspecified unlawful activity, so the defendant does not need to know that it is specifically healthcare fraud. It is sufficient that he know that it comes from some form of unlawful activity. So I believe that the defendant's allocution in this regard is sufficient under the statute.

ECF No. 309, September 18, 2023 change of plea hearing Tr., at 21:23-22:13.

> The admitted offense conduct for Count One continues, as follows:

> (2) In or about April 2021, the Wisnicki Firm was served with a subpoena from a grand jury sitting in the Southern District of New York (the "Subpoena"). Among other things, the Subpoena required the Wisnicki Firm to produce documentation concerning the checks described in paragraph (1) above. Wisnicki then communicated with CC-1 and learned that the proceeds of the checks described in paragraph (1) above were the proceeds of some form of unlawful activity.

> (3) Wisnicki, CC-1, and unindicted co-conspirator 2 ("CC-2") agreed to respond to the Subpoena by submitting fabricated documents to the grand jury, lying in communications with the United States Attorney's Office for the Southern District of New York, and committing perjury before the grand jury.

> (4) Wisnicki, CC-1, and CC-2 further agreed to launder the proceeds of the checks described in paragraph (1). At the direction of CC-1, Wisnicki wrote checks, drawn on his IOLA, purporting to return the monies that had been previously paid to his firm. The checks were made payable to physicians who purported to be owners of the No-Fault Clinics and to family members of the Clinic Controllers (together, the "Payees"). Wisnicki wrote the checks under the false pretense that the Payees were

clients of the Wisnicki Firm who had previously paid monies to the Wisnicki Firm for legal services.  Wisnicki and others agreed that the checks to the Payees would be deposited, and the monies would then be withdrawn and returned to the Wisnicki Firm. Wisnicki delivered the checks to CC-1 for this purpose.

(5) Thereafter, on or about April 19, 2021, Wisnicki submitted to the grand jury over a dozen fabricated retainer agreements. The same day, Wisnicki falsely stated to the United States Attorney's Office that the funds paid to the Wisnicki Firm "were originally supposed to be used for a [sic] retainer fees, which is why the agreements were originally prepared," but that the clients ultimately "instead asked us to hold the funds to be used for future investments."  Wisnicki further represented that the Wisnicki Firm decided to return the retainer fees after receiving the Subpoena.

(6) On or about July 6, 2021, Wisnicki was called to appear before the grand jury as custodian of records for the Wisnicki Firm. Wisnicki falsely testified to the grand jury, among other things, that payments to the Wisnicki Firm had been made for the purpose of opening a "lending platform" that was never completed, and that Wisnicki had not spoken to anyone outside of the Wisnicki Firm about the Subpoena.

Plea Agreement at 10.

Count Two of the Superseding Information charged conspiracy to commit wire fraud and is based upon Dovi's self-disclosed misconduct. Dovi pleaded guilty, and admitted the following:

(1) In approximately 2007, Wisnicki engaged in a transaction that resulted in a loss to a client ("Client-1"), whose money Wisnicki held in the Wisnicki Firm's IOLA accounts.  Wisnicki improperly transferred money from other clients' IOLA accounts, without telling those other clients, to repay Client-1.

(2) Around the same time, Wisnicki began a real estate investment business using the Wisnicki Firm. Existing clients of the Wisnicki Firm ("Investor Clients") asked Wisnicki to identify potential real estate investment opportunities for them.  The Investor Clients then either transferred monies to Wisnicki or asked him to retain their monies that were already held in the Wisnicki Firm's IOLA accounts. Wisnicki then identified real estate investment opportunities for the Investor Clients and the Wisnicki Firm represented the Investor Clients in the resulting investment transactions.

(3) The Investor Clients began suffering losses in the investments that Wisnicki had arranged.  Rather than notify the Investor Clients of their losses, Wisnicki used monies from Wisnicki Firm clients who did not participate in the real estate

investments, which were held in trust in the firm's IOLA accounts, and transferred those monies to the Investor Clients to mask their losses. Wisnicki represented to these other clients that their monies were still held in the Wisnicki Firm's IOLA accounts when in fact he had transferred those monies to his Investor Clients.

(4) Wisnicki also used monies from new Investor Clients to cover up losses suffered by prior Investor Clients. Wisnicki told the new Investor Clients that their monies would be invested in real estate when in fact he used those monies to repay his prior Investor Clients.

(5) Wisnicki continued the above-described fraud through at least in or about 2022. Wisnicki owes approximately $18.8 million to certain Investor Clients, which includes approximately $6.3 million to members of his family and approximately $12.5 million to non-family members. He is also owed approximately $6.7 million by various former clients.

Plea Agreement at 11.

Set forth below is an analysis of Dovi's case under both the advisory Sentencing Guidelines and 18 U.S.C. § 3553(a).

\*       \*       \*

## I.   THE ADVISORY GUIDELINES ANALYSIS

### A.   The Guidelines Calculation Set Forth In The Plea Agreement

Under the parties' Plea Agreement, Count One, conspiracy to commit money laundering, carries an offense level of 20.[1]   Count Two, however, conspiracy to commit wire fraud, has a higher offense level, and therefore drives the Guidelines calculation.

**As to Count Two, the parties agreed as follows:**

| | |
|---|---|
| Base Offense Level | 6 |
| Loss Amount ($18.8 million) | +20 |
| Conduct Constituting Sophisticated Means | +2 |

---

[1] As set forth in the Plea Agreement at 3 (citing Guidelines sections): The base offense level for this offense is eight. Ten levels are added because the amount of the laundered funds is $210,548.06 (more than $150,000 but not more than $250,000).  Two levels are added for obstruction, with no reduction for acceptance of responsibility, for an offense level of 20.

| | |
|---|---|
| Reduction For Acceptance Of Responsibility | -2 |
| Additional Reduction/Timely Notice Of Intent To Plead Guilty | <u>-1</u> |
| Offense Level | 25 |

**Grouping Analysis/Multiple Count Adjustment**:

Number of Units = 1.5[2]

| | |
|---|---|
| Additional Offense Level | <u>+1</u> |
| **Combined Total Offense Level** | **26** |
| **Criminal History Category** | **I** |
| **Sentencing Range** | **63-78 months** |

Turning from the Plea Agreement to Judiciary Sentencing Information ("JSIN") data:

| **JSIN Data**[3] | |
|---|---|
| **Average Length Of Imprisonment** | **51 months** |
| **Median Length Of imprisonment** | **51 months** |

*     *     *

**B.     The Guidelines Calculation Set Forth In The PSR**

The PSR accepted the parties' agreed upon calculations, set forth above—with one

material exception: the PSR *added four offense levels* on the ground that the offense allegedly

resulted in substantial financial hardship to five or more victims.  Accordingly, under the PSR:

---

[2] *See* Plea Agreement at 4 (citing Guidelines sections): Count Two (for this purpose, Group Two) has the higher offense level (25).  Count One (Group One) has an offense level of 20, which is five levels less serious than the offense level for Count Two (Group Two).  This results in a total of one and one-half Units, which, in turn, increases the higher offense level (25) by one (to 26).

[3] *See* https://jsin.ussc.gov/analytics/saw.dll?Dashboard: During the last five fiscal years (FY2018-2022), there were 235 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 26 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 departure for substantial assistance. Some 225 defendants received a sentence of imprisonment in whole or in part.

**As to Count Two:**

| | |
|---|---|
| Base Offense Level | 6 |
| Loss Amount ($18.8 million) | +20 |
| Specific Offense Characteristics: | |
| Substantial Financial Hardship to Five Or More Victims | +4 |
| Specific Offense Characteristics: | |
| Conduct Constituting Sophisticated Means | +2 |
| Adjusted Offense Level | 32 |

**Grouping Analysis/Multiple Count Adjustment**:

| | |
|---|---|
| Number of Units = 1.0[4] | |
| Additional Offense Level | +0 |
| Combined Adjusted Offense Level | 32 |
| Reduction For Acceptance Of Responsibility | -2 |
| Additional Reduction/Timely Notice Of Intent To Plead Guilty | -1 |
| **Total Offense Level** | **29** |

| | |
|---|---|
| **Criminal History Category** | **I** |
| **Sentencing Range** | **87-108 months** |
| **JSIN Data[5]** | |

---

[4] *See* PSR at 22 (citing Guidelines sections): Count Two (for this purpose, Group Two) has the higher offense level (32). Count One (Group One) has an offense level of 20, which is twelve levels less serious than the offense level for Count Two (Group Two). Count One (Group One) is therefore disregarded. This results in a total of one Unit, which, in turn, maintains the offense level at 32.

[5] *See* PSR at 37 (setting forth information from the Sentencing Commission's database): During the last five fiscal years (FY2018-2022), there were 124 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 29 and a Criminal History Category of I, after excluding defendants who received a § 5K1.1 departure for substantial assistance. Some 122 defendants received a sentence of imprisonment in whole or in part.

| | |
|---|---|
| **Average Length Of Imprisonment** | **65 months** |
| **Median Length Of imprisonment** | **63 months** |
| **PSR Recommendation as to Imprisonment** | **78 months**[6] |

During the plea negotiations in this case, the government did not seek, and the defense did not have any need to confront, an increase in the offense level, pursuant to U.S.S.G. § 2B1.1(b)(2)(B), based on any alleged substantial financial hardship to five or more victims. The Probation Office, *sua sponte*, found such hardship, a finding that has a material impact on the Guidelines calculation. That finding increases the advisory Guidelines range from 63-78 months to 87-108 months—an increase of 24 months at the low end of the range and 30 months at the high end of the range. That finding also increases the average and the median sentences reflected in JSIN data—from 51 months to 63-65 months. No information supporting the enhancement was produced to the defense beyond what is described in the PSR. Accordingly, the defense objected to that enhancement. *See* PSR, at page 42.

On January 30, 2024, two days before the due date of this memorandum, Probation permitted defense counsel to view, in the Probation Office, certain materials submitted by victims – letters, interview notes and the like – that Probation believes support the substantial financial hardship enhancement. After having reviewed the material made available by Probation, the defense does not dispute that the victims who contacted Probation suffered significant losses. Nor does the defense dispute the claim that one group of investors made to Probation that its funds were misappropriated after the original Indictment in this case was filed.

---

[6] The PSR recommends a sentence of 39 months on each Count, to run consecutively. *See* PSR at 47.

However, the defense is not in a position to verify or concede that Dovi caused substantial financial hardship to five or more investors.

The Court, of course, is bound by neither the Plea Agreement nor the PSR, although the Court must make findings and reach a conclusion regarding the Guidelines. We respectfully urge the Court to adhere to the Plea Agreement. The Guidelines analysis and conclusion set forth in the Plea Agreement are legally correct. They provide an appropriate, and a sufficient, "starting point and the initial benchmark" from which the Court can proceed to the statutory factors under 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).

The Plea Agreement, furthermore, establishes the foundation—a contractual foundation—on which the parties resolved their disputes. *See, e.g., United States v. Green*, 897 F.3d 443, 447 (2d Cir. 2018) (holding that plea agreements are "review[ed] . . . in accordance with general principles of the law of contract[,]" and "construe[d] . . . strictly against the government[]); *Lilly v. City of New York*, 934 F.3d 222, 236 (2d Cir. 2019) (noting "the first principle of contract interpretation: where the language of the contract is unambiguous, the contract is to be given effect according to its terms[]") (cleaned up). Judicial adherence to the terms of a plea agreement provides a measure of certainty in the midst of the otherwise highly uncertain and fraught process of sentencing. Such adherence has the salutary effect of encouraging compromises by the government and guilty pleas by defendants.

We respectfully submit that the Court should adhere to the Sentencing Guidelines calculations set forth in the Plea Agreement.

## II.    THE FACTORS SET FORTH IN 18 U.S.C. SECTION 3553(a) COUNSEL A MOST LENIENT SENTENCE

The Sentencing Guidelines mark only the "starting point and the initial benchmark" at sentencing.  *Kimbrough*, 552 U.S. at 108-09 (quoting *Gall*, 552 U.S. at 49).  Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below.

Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in section 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to serve the objectives of sentencing."  *Kimbrough*, 552 U.S. at 91 (quoting 18 U.S.C. § 3553(a)).

Title 18 U.S.C. § 3553(a) provides:

The court, in determining the particular sentence to be imposed, shall consider—(1) The nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established [under the Sentencing Guidelines]; (5) any pertinent policy statement . . . issued by the Sentencing Commission[;] (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to the victims of the offense.

### A.    Subsection (a)(1)

Subsection (a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]" As part of this analysis, a

sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50. In this regard, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Underlying that tradition is "the principle that the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quotation and citation omitted).

In attempting to ensure that the punishment fits the individual defendant, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000). Thus, the defendant's "history and characteristics," the "likelihood that he will engage in future criminal conduct," "his present purposes and tendencies," and "the period of restraint and the kind of discipline that ought to be imposed upon him" are relevant. *Pepper*, 562 U.S. at 492–93 (citations omitted).

### i.    The Nature And Circumstances Of The Offense

Using his law practice and his IOLA account, Dovi Wisnicki misdirected and misappropriated millions of dollars. He did so for an extended period of time. He also allied himself with persons involved in criminal activity, took advantage of innocent clients, and lied to a grand jury about his actions. His conduct was not aberrational; it went on for years. He blames nobody but himself, and he takes full responsibility for his actions.

Nevertheless, we respectfully submit that Dovi's crimes, however serious, were not crimes of excess, gluttony, or self-indulgence. They were not motivated by malevolence, cruelty,

greed or ego. He did not seek to enrich himself through his criminal activity.  He did not agree to divert or launder money in order to finance a luxurious lifestyle. And the *last* thing he wanted to do was to hurt his clients or investors—many of whom were friends and relatives.  Rather, Dovi convinced himself that occasional use of his IOLA account as a quick fix to cover short-term cash flow issues and to plug gaps, although unlawful, would not come back to hurt his clients or compromise his standing as a lawyer.

Dovi was wrong.  Covering one payment by using another led to a long, downward spiral. The ability to make whole his clients and investors got away from him. He fell deeper and deeper into an abyss, and his financial woes were compounded by fear, shame and embarrassment.  He woke up every day faced with the reality that he was on a path that would lead to disgrace. The worse it got, the more he panicked and the more his judgment was clouded. Feelings of overwhelming stress and pressure consumed him.  Dovi was in survival mode. He did not want to let anybody down.  He was scared.

In short, the misconduct here was without a hint of malice or decadence.  It was so rudimentary, so defenseless, and so senseless, that it should be viewed, more than anything, as the desperate undertaking of a good, but frightened, man who let things get out of control and could not find a way out.

### ii.      Dovi Wisnicki's History And Characteristics

An extraordinary collection of over 170 letters from Dovi's family, friends, professional colleagues, former clients and community members attest to his character, rectitude, dignity, responsibility, decorum, and morality. The letters come from a wide variety of people who know right from wrong, who understand ethical boundaries, and who appreciate the importance of following rules. They are doctors, lawyers, accountants, social workers, clergy, charity

executives, a police officer, and educators of all levels.  Remarkably, a number of the letters seeking leniency for Dovi come from investor-victims who suffered as a result of his financial misconduct.

The letters of support speak volumes about the basic goodness of Dovi Wisnicki despite his bad acts. They provide compelling evidence that Dovi is much more than a man who committed crimes.  He is a soft spoken, kind-hearted, spiritual and humane individual. As one of his cousins outlined for the Court, "The person before you is not just a criminal defendant, he is a deeply feeling and sensitive person. He cares about people and has lived his life according to the principles he was raised with including Torah study . . . charity . . . and good deeds." (Ex. A-21).

### a.    Early Life And Background

Robert "Dovi" Wisnicki was born on January 6, 1979, in Los Angeles, California. His father, Norman Wisnicki, is a lawyer, and his mother, Harriet, works as a bookkeeper at a nursing home.  The Wisnicki family is known in their community and among their friends as "tight knit" (Ex. A-79) and "paragons of honesty and integrity." (Ex. A-73).

Norman and Harriet are observant Jews and raised their family in that rich tradition. Dovi and his brothers and sister grew up in a modest, but warm and loving, Jewish home. Dovi's adolescence was filled with rigorous secular and religious studies and defined by the rituals and routines of an orthodox Jewish family—daily prayers, a kosher diet, attending temple on the Sabbath and holidays.  Dovi grew up to be a devout and pious person.

Norman and Harriet raised their four children not just to follow the rules and rituals of Judaism, but also to act with "menschlikhkeit," that is to be humane, decent, kind, noble and other-focused. As an adolescent, Dovi was popular, but not arrogant.  He was successful in school and sports, and he was always compassionate. He knew that service to others was

paramount, and he revered his grandparents, who were Holocaust survivors. "Dovi was a very pleasant child and teenager with a wonderful demeanor, [who was] very accommodating, always with a smile and ever helpful." (Ex. A-158).

The rabbi of his childhood synagogue recalls that "Dovi was truly a model congregant from a very early age. He was admired by the younger attendees, respected by his peers, and appreciated by the adult members. Dovi is genuinely religious and even as a youth always attended and actively participated in the services. As a young teenager, he was always ready to help with any of the projects of the synagogue." (Ex. A-12). He "was one of the boys who reached out to the less popular students, to newcomers, and to those who struggled socially and academically." (Ex. A-34). In Yiddish parlance, Dovi's parents raised a "mensch."

Dovi's kindness and generosity continued through high school, two years of study in Israel, and into college and his studies at Ner Israel Rabbinical College in Maryland. David Coronel, a college friend, tells of Dovi helping him settle into new surroundings, integrate socially and challenging him to be a better student. He recalls that even then, Dovi was "willing[] to go the extra mile when someone was in need." (Ex. A-17).

### b.    Legal Career

Following in his father's footsteps, Dovi graduated from law school and set out to build a legal career. After working as a bank attorney focused on real estate transactions, Dovi eventually opened his own small firm. Like his father, Dovi sought to bring to his legal work the same sense of decency and civility that he practiced in his religious life. Although despondency would eventually cause him to violate repeatedly his attorney oath, the misconduct did not permeate every aspect of his practice. He compartmentalized it. In many respects, he practiced law with "exceptional moral character" (Ex. A-14). Thus:

Yosef Sinensky, Corporate Counsel for FM Home Loans, for whom Dovi acted as closing attorney on hundreds of loans, says: "[Dovi] skillfully handled all of the closings in a professional manner and without any issues whatsoever. Our company relied heavily on [his] skills and professionalism and he was a highly sought after closing attorney with a sterling character." (Ex. A-131).

In a similar vein, E. Isaac Aryeh, the Senior Vice President of The Federal Savings Bank and a mortgage banker, describes Dovi as "kind hearted, soft spoken" and the kind of lawyer who would "reduce his fees significantly" when Mr. Aryeh brought him "a client . . . having financial difficulty."  (Ex. A-5).  Avi Dubin, a residential broker in Dovi's community, highlights his "professionalism":

> All the other brokers and attorneys that work with him always enjoy working with him on a deal... He never gets upset and is always working to find a solution.... He has been one of my go-to attorney's [sic] on residential transactions and the reason is because of his level-headedness and desire to really help.

(Ex. A-26).

Alex Shulman, a fellow attorney, gave Dovi high praise for his approach to a real estate matter:

> Dovi was our real estate attorney on a few residential purchases and sales. Throughout the course of representation he was professional, thorough, and extremely competent. During one of the transactions an issue came up between us and the realtor. Dovi quickly began figuring out a way to make peace and find a resolution between both parties. He called each of us to find a solution in a friendly and peaceful way. It was because of his friendly and peaceful demeanor that we were all able to come to a resolution that satisfied both parties.

(Ex. A-125).

Fredric Sugarman, a Dean at Yeshiva College, speaks fondly of Dovi's grace in helping Dr. Sugarman's in-laws sell their properties. They were an elderly couple who survived the Holocaust, and wary of potential buyers taking advantage of them. Dovi handled the sale "with a

light touch and love for two individuals who were not part of his immediate family. The charges -- $0." (Ex. A-143).

Dovi also became "a friend and mentor to many younger attorneys in the industry . . . He has been selfless with his advice . . . and generous . . . with his guidance" even though it may have "removed much of the competitive advantage[] he had industrywide." (Ex. A-107). Nosson Abrams tells of Dovi helping Mr. Abrams get his own law practice started, sharing space with him free of cost, and referring clients to him to get his practice going. (Ex. A-3). Mr. Abrams ultimately built a private practice that allowed him to maximize time with his family, something he could only have done "[t]hrough Dovi's quiet help." *Id*.

Another lawyer, David Alishaev, notes that when he encountered personal challenges:

> I distinctly remember reaching out to Dovi (Robert) for advice and guidance. His willingness to extend his expertise and provide invaluable counsel played an instrumental role in helping me navigate those complexities with confidence and competence. It is through such instances that I not only witnessed his legal prowess but also experienced firsthand his unwavering commitment to assisting colleagues in need.

(Ex. A-4). *See also* letter of Rabbi Bentzion Chait (discussing Dovi's "warmth, sense of humor and . . . infinite patience" as a lawyer in a time of "intense pressure" following serious physical injury to a Holocaust survivor (Ex. A-14).

Benjamin Davidman, a former associate in Dovi's law office observed:

> On a daily basis, I witnessed Dovi's unwavering dedication to helping others. He consistently demonstrated kindness, patience, and a genuine concern for those around him. Whether in a professional or personal capacity, he provided guidance and support, creating an environment conducive to growth and learning.
>
> I observed Dovi's active involvement in charitable endeavors, with representatives from various organizations visiting his office regularly. Beyond financial contributions, he consistently offered his time and support, exemplifying a commitment to making a positive impact on the lives of others.

(Ex. A-18).

The Parnes family writes about Dovi's legal work for their elderly relatives: "Regardless of the work involved, Dovi took full legal responsibility and did not accept payment for his services. They were acts of love, loyalty, and generosity." (Ex. A-100).

Notwithstanding these flattering and complimentary opinions, Dovi understands that his misconduct diminishes his professional achievements.  It is his sincere hope that he can find a way to use his knowledge, experience and training to make amends, be better, and do some good in the world.

### c.      Commitment to Family

Dovi's life revolves around his wife and kids.  They are the center of his universe.

Dovi has been married to his wife, Yonina, for 24 years. By all accounts, Dovi treats Yonina "like a queen."  (Ex. A-164).  According to Yonina, "[f]rom the day we were married Dovi has always cared, not only for me, but for all those around him as well. One of the reasons I married him was because I was able to see how beloved he was by his friends and his peers. Dovi always surrounded himself with good, kind and warm-hearted people." (Ex. A-169).

Dovi and Yonina have five wonderful children: Avi (22), Leora (20), A███ (16), K███ (12) and D███ (6).  Dovi "always manag[es] to put the kids and [Yonina] first even though he had a busy work schedule." *Id*.  The kids "are polite, sweet and giving," (Ex. A-122) and Dovi "is a father who is involved in every aspect of his children's upbringing." (Ex. A-123).  The parent-child relationship is sacred to the Wisnickis, and Dovi and Yonina strive to live by the Jewish Proverb that offers this guidance: "Train a child in the way they ought to go; they will not swerve from it even in old age." (Proverbs 22:6).

"Although both Dovi and Yonina work hard to raise their children properly, Dovi is the parent their children invariably turn to for sound, level, and comforting support. Dovi is the rock

and foundation of his family and has dedicated his life to raising his children in the most loving and supportive environment." (Ex. A-165).  He drives the kids to school, coaches sports, helps with homework, advocates for them when it's needed and emphasizes ethics.  It is no surprise, therefore, that one psychotherapist says: "The ideal parent would look similar to . . . [Dovi]….[He] epitomizes what it means to be a model parent and role model."  (Ex. A-1).

David Wisnicki, Dovi and Yonina's eldest child, who is recently married, recognizes his father's tremendous commitment to family:

> As a loving parent, my father has always prioritized our well-being, providing support, guidance, and encouragement in every aspect of our lives. As his oldest son, I have witnessed a never-ending list of how deeply my father has impacted my life. My father is a fantastic mentor, friend, and husband.

(Ex. A-164).

Dovi's devotion to his children and his demonstrated commitment to raising them with respect for law and ethics provides further evidence that the man who committed the charged crimes never completely lost his integrity. Dovi's crimes were the misguided byproduct of his self-created circumstances, but not the acts of a constitutionally immoral man.

Observes Dovi's cousin, Nava Diamond:

> As a father, Dovi's patience, fun-loving spirit, and understanding shine brightly. His involvement in his children's lives goes beyond that of a mere spectator; he actively participates in their activities, be it through sports or academic support, consistently serving as their most enthusiastic supporter. Like his parents, Dovi is integrally involved in each of his children's lives. The [e]ffect of Dovi being separated from his wife and children for a prolonged period will be devastating especially his youngest son, D██, who will turn 7 this year.

(Ex. A-24).

Dovi's daughter Leora describes what he means to their family:

> [M]y father is the glue that holds us together. From his unwavering support and love, to his fun stories, my father just wants us all to be happy and feel loved. He accomplishes that every day as a father, husband, and friend. I watch him constantly

put the needs of others before his own, make others smile and laugh, and be a true example of a real leader.

And then, in emotional terms, that her family "will be broken" without their father:

> My father and my family have already gone through so much since my father has been arrested and I'm scared of the outcome of my father going to prison can have on our family. My siblings have watched my father get arrested and taken out of our home 2 years ago, and are still dealing with it emotionally and mentally. My father's absence will break us completely.

(Ex. A-166).

Virtually every letter submitted on Dovi's behalf describes his deep and abiding love for his family. "Devoted." "Exemplary." "Caring." "Integral." "Responsibility." "Fun." "Respectful." "Family man." "Mainstay." These are but a few of the words used to describe his commitment to family. But Yonina, who cries during synagogue prayers when she thinks about the prospect of Dovi's incarceration, offers the most heart-wrenching words:

> I can't live without my husband. Dovi is my whole life . . . I need Dovi as a husband and our kids need him as a father.

(Ex. A-169).

### d.    Community Involvement

Dovi's big heart extends beyond his immediate family and to the broader community. His parents give the background:

> We have always emphasized to all our children the importance of developing a real connection with a community and contributing to it meaningfully. Dovi (and Yonina) have done so on multiple levels. Dovi is deeply involved in charitable organizations which provide social and support services for needy families, and supports institutions dedicated to helping youth who are "at risk". Dovi (and Yonina) have contributed financially and otherwise to these organizations and have been honored by them at community functions.
>
> We have watched with pride as Dovi has forged a deep, meaningful relationship with the Rabbi of his synagogue, and the members of his congregation. Dovi constantly seeks and values his Rabbi's advice [and] guidance. The members of his

synagogue are not just his friends but his brothers. They are always there for Dovi because Dovi is always there for them.

(Ex. A-165).

Dovi's service to the Achiezer social service program is truly noteworthy. Achiezer is a multi-faceted community resource center and social service program that helps community members in crisis. www.Achiezer.org.  Several years ago, when the program needed more volunteers to "guide and help families during their difficult times," Dovi and Yonina came through, getting involved and helping with different programs. (Ex. A-10).  And their commitment endures. As the President of Achiezer recounts: "Whenever there is a need in the community, Dovi is always willing to help. He makes himself available and spends many hours visiting sick patients in hospitals and delivering food to those who are unable to fend for themselves."  He continues: "[Dovi] has encouraged his family to participate in his volunteer work and they have gone to stock our hospital respite rooms and ensure that patients and their families have [] what food and comfort they need." *Id.*

Dovi has also been a "sincere enthusiast" for the mission of a local community organization known as Madraigos, which helps at-risk teens and others who are going through crises. (Ex. A-129). "Madraigos offers a wide array of innovative services & programs geared towards empowering teens, young adults, and families to overcome life's challenges one step at a time."  www.Madraigos.org/about. Dovi has provided financial support, and has dedicated time and legal services—"at all hours of the day or night"—to further Madraigos's work. *Id.* He has also been "instrumental" in helping the Rofeh Cholim Cancer Society, www.RCCScancer.org, a non-profit organization that provides an array of services to cancer patients and their families. (Ex. A-91).

Dovi's community service is not limited to working with charitable organizations. He is a friend to whomever needs one. The scores of letters submitted on his behalf are replete with stories of Dovi rushing to get medication for someone in a remote area; attending to the needs of elderly friends and neighbors; walking great distances to show support for family and friends; participating in charitable events and mentoring programs; and coming to the aid of children who are sick, face developmental challenges, or find themselves in difficult circumstances:

> [D]uring Covid there was a special needs boy that was becoming a Bar Mitzvah and wasn't able to have any type of celebration or anything really, due to social distancing required. Robert was very involved in making sure a group of us went to this boy's home and sang for him (standing from the streets) the boy's favorite songs…
>
> [Dovi] also joins a group of about 4 or 5 of us that go to a terminally ill lady that has ALS and is confined to a bed, only communicating with her eyes from a computer. We usually go and sing for her right before each holiday without any fanfare or anyone knowing about it, just to make her and her family happy. Again, this is not something he brings attention to. . .

(Ex. A-96).

No less an authority than Rabbi Meyer May, the Executive Director of the Simon Wiesenthal Center, describes being "profoundly impressed by Dovi's wide-ranging community service. . . He, together with his wife, have selflessly given of themselves and have justifiably earned the admiration of their neighbors. I believe that this altruistic Dovi Wisnicki is the real Dovi Wisnicki." (Ex. A-89).

Consistent with his quiet nature, Dovi always "does his charity with humility." (Ex. A-130).  His sister-in-law notes that:

> [M]uch of what [Dovi] has done for the community has been behind the scenes and without attention or fanfare. While running his business, he truly cared about the well-being of his employees. There were numerous times when he retained employees who were performing at a subpar level because of their personal circumstances, either because someone was a single mother, an older widow, or had health issues. (He even retained a very ill individual until her death, paying her

for the months she was unable to work and later covering half of her funeral costs). He did this because he knew how important a livelihood was to these people who were already dealing with challenging circumstances. Even though this added another layer of difficulty for him, Robert was willing to retain these employees because he cared about them as human beings.

(Ex. A-85).

Don and Tamar Miller put it this way: "Dovi is by far the most authentic, altruistic, generous, faithful, kind, and good-hearted person we know in our town." (Ex. A-92).

Levi Kirshner sums it up well: "Dovi Wisnicki is one of my biggest Role Models, I hope that in my life I can be half as good a man as Dovi." (Ex. A-67).

\*     \*     \*

The foregoing explains why, even after Dovi's misconduct became public, "dozens of friends, relatives, clients, investors, and community members flocked to Dovi and Yonina's home. Each of them [said] that they loved Dovi because of his innate goodness and kindness and would always be there for him. Each person emphasized how important Dovi's presence is in their lives and the void his absence would create for each of them." (Ex. A-165). Dovi's current employer, a title company, hired him knowing full well about the criminal charges against him and found his "work performance . . . exemplary in every single way." (Ex. A-138).

Members of his family and community stand by Dovi also because they see that he has not shirked responsibility or shied away from his misdeeds. Many letters echo these sentiments:

- "[Dovi], in his humility, acknowledges his wrongdoing and has taken full ownership of his actions." (Ex. A-1).

- "He has used this situation . . . to become a better person." (Ex. A-124).

- He "has done much introspection [and] self-evaluation." (Ex. A-129).

- "He is the type of individual who will surely learn from his mistakes and use it as a springboard for growth and improvement." (Ex. A-118).

- "I firmly believe that . . . he is genuinely remorseful for his actions and has taken steps to address the wrongful behavior and learn from his lapses" (Ex. A-127).

- "It is clear to me from conversations we had in the past year that he is extremely remorseful for what he did." (Ex. A-150).

- "In my conversations with [Dovi] in recent months, I have found him to be contrite and remorseful, not because he was caught, but because he acted beyond himself. He understands the errors of his actions and accepts responsibility." (Ex. A-156).

- Dovi is "deeply committed to a program of repentance and repair." (Ex. A-153).

- "I truly believe [Dovi] is committed to making amends for his mistakes." (Ex. A-138).

There is perhaps no greater testament to Dovi's true character and standing within his community than the letters of support written by investor-victims who suffered financial losses as a result of his actions.  This is indeed the rare fraud case in which investor-victims extol the virtues of the defendant's character and beseech the court to be lenient in sentencing.

- Rabbi Dov Osina:  "[A]lthough I am one of the investors who have lost money with [him], I bear him no ill will…please show as much leniency as possible" (Ex. A-98).

- Carolyn Diamond: As "an investor who may lose a substantial sum of money . . .  I can ask that the court take into account the totality of who Dovi is when imposing a sentence and consider his wife, his children and extended family and the repercussions on them. This is a family that supports each other, and we will continue to support Dovi and all other members of our family."  (Ex. A-20).

- Dr. Ezriel Diamond: "I and my wife were investors with Dovi and may not see our investment returned to us. Even still, I love my nephew, I support him and am a stern advocate for his receiving the lowest while still appropriate sentence." (Ex. A-22).

- Sol Greenspan: "Recognizing that the invested funds may never be recovered does not make me or my family very happy. However, I do believe, that a lifetime of good should not be ignored.  The two best words to describe [Dovi] are Family and Charity." (Ex. A-49).

- Rabbi Ahron Kaufman – "I, too, have placed my trust in Dovi entrusting him with a sum of money earmarked for my retirement.  Despite the challenges he faces, my faith in him remains unshaken." (Ex. A-66).

- J. Ari Majer: "Members of my close family are included in the people who have been harmed . . . However, I stand with the many who do not want to see Dovi separated from his family for any period of time.  I know that he will continue to rehabilitate…." (Ex. A-83)

- Joseph Manela: "I invested a substantial sum of money with Robert (Dovi) Wisnicki and am aware that he has plead guilty and will be sentenced soon. I am writing this letter to respectfully request that [Y]our [H]onor be lenient in your sentence. . . . Notwithstanding my having invested money with Dovi, and his having plead guilty, I truly believe that Dovi is at his core an honest, sweet, caring and good person. . . I fear that incarceration will destroy him." (Ex. A-86).

- Daniel Wisnicki – "I have also invested substantial sums of money with [Dovi] . . . I have been around [Dovi] his whole life and can truly attest to the moral compass and compassion as a loving husband, father, and friend." (Ex. A-163).

- Norman and Harriet Wisnicki – "We have also invested a substantial amount of money with Dovi . . . . We . . . beg for your mercy." (Ex. A-165).

## B.        Subsection (a)(2)(A)

Subsection (a)(2)(A) provides that the court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  As demonstrated below, Dovi has suffered significant and substantial punishment, and will continue to do so, even without a long term of imprisonment.  A most lenient sentence, therefore, would not unduly depreciate the seriousness of the offense or promote disrespect for the law.  On the contrary, a most lenient sentence would impose a sufficient—indeed, a just—punishment.

In this respect, it is important to note that the Sentencing Commission promulgated a new Guideline, § 4C1.1, effective November 1, 2023. *See* Adopted Amendments (Effective November 1, 2023), UNITED STATES SENTENCING COMMISSION, available at:

https://www.ussc.gov/guidelines/amendments/adopted-amendments-effective-november-1-2023.

That new Guideline addresses the case of the so-called "zero-point offender," who—like Dovi—

has no criminal history points. Subsection (a) of that new Guideline provides:

> ADJUSTMENT.—If the defendant meets all of the following criteria:
>
> (1) the defendant did not receive any criminal history points from Chapter Four, Part A;
>
> (2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);
>
> (3) the defendant did not use violence or credible threats of violence in connection with the offense;
>
> (4) the offense did not result in death or serious bodily injury;
>
> (5) the instant offense of conviction is not a sex offense;
>
> (6) the defendant did not personally cause substantial financial hardship;
>
> (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights);
>
> (9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense); and
>
> (10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;
>
> decrease the offense level determined under Chapters Two and Three by 2 levels.

Proposed amended Commentary—specifically, a new Application Note 4(A) to § 5C1.1—drives

home the Commission's view that zero-point offenders, who would qualify for an adjustment

under § 4C1.1(a), generally should not go to prison. That new Application Note provides: "If the

defendant received an adjustment under § 4C1.1 . . . and the defendant's applicable guideline

range is in Zone A or B . . . a sentence other than a sentence of imprisonment, in accordance with subsection . . . (c)(3), is generally appropriate."

Dovi clearly meets nine of the ten requirements for the § 4C1.1 adjustment. As to subsection (6), as noted above, the defense is not in a position to verify or concede that Dovi caused substantial financial hardship to five or more investors. We nonetheless submit that the Court should give these factors a measure of consideration when conducting its analysis under 3533(a)(2)(A).

### i.    The Prosecution and Its Collateral Consequences Have Already Imposed Significant Punishment

A court, when imposing sentence, should consider the collateral consequences of the defendant's conviction. Indeed, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

Here, indisputably, Dovi has suffered, and will continue to suffer, significant collateral consequences as a result of his conviction. He, of course, will suffer the usual collateral consequences of a felony conviction, under both state and federal law. He will lose, for example, his right to vote, his right to hold office, his right to sit on a jury and perhaps his ability to obtain various professional licenses.

More particularly, however, Dovi is no longer a lawyer. He worked hard for many years as a lawyer, faithfully helping countless clients and colleagues. Now, he has lost the ability to practice the only profession he has ever known. His reputation, previously unsullied, now lies in tatters. His livelihood is gone. *See Stewart*, 590 F.3d at 141 (conviction "made 'it doubtful that the defendant could pursue' his [prior] career . . . and therefore . . . the need for further

deterrence and protection of the public is lessened because the conviction itself 'already visits substantial punishment'").  This loss is excruciating for someone who loved his work.

For Dovi, finally, a conviction in itself imposes serious punishment.  He has no prior criminal history; the status of "convicted felon" therefore delivers a more significant blow.  That status itself is a major punishment in this case—more than sufficient to satisfy the statutory requirements.

In short, Dovi Wisnicki has already been, and will continue to be, punished, wholly apart from any prison sentence that the Court can impose.  "The consequences of Dovi's actions have taken the spark from Dovi's eyes, and it is painful to see. Dovi still constantly has a smile, but one who knows him can feel the pain behind the smile." (Ex. A-173).  Courts around the country have recognized that consequences like these constitute punishment.[7]

---

[7] *See, e.g.*, *United States v. Sponaugle*, Case No. 19-103-LPS, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on the defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence, in part, because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant suffered loss to his professional reputation and lost his high-paying job); *United States v. Jasen*, 8:15-CR-00214-JDW-TBM (M.D. Fla. Jan. 28, 2016), ECF No. 191 at 84-85 (imposing probation because, in part, "one who makes a mistake in judgment . . . should be, in my judgment, absent other aggravating circumstances, be able to go with their life and suffer the humiliating and devastating effects of being prosecuted . . . which will . . . harm your reputation, your social status[]"); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence, in part, because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F. Supp. 2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence, in part, because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Anghaie*, 1:09-CR-00037-MW-GRJ (N.D. Fla. Nov. 29, 2011), ECF No. 238 at 34 (imposing below-Guidelines sentence and noting that defendants "received significant punishment through financial loss, loss to reputation and career opportunities."); *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation).

C.        Subsection (a)(2)(B)

According to 18 U.S.C. § 3553(a)(2)(B) an appropriate sentence should "afford adequate deterrence to criminal conduct[.]"

i.        Specific Deterrence

This case has indisputably achieved specific deterrence.

Dovi, having surrendered his law license, will not be in a position to commit fraud through a law practice, or to transfer money under the cover of client transactions.  *See, e.g., United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (defendant "yielded to a temptation and committed a crime particularly adapted to his chosen career.  That career is over, and his potential to commit this particular type of crime has been eliminated.").

Dovi, moreover, is keenly and painfully aware that he has, through criminal conduct, seriously hurt the family he loves.  Indeed, he has jeopardized the basic welfare of his family.  His livelihood is gone.  His family may well lose their home, which pains him greatly, considering that his top priority in life has been to take care of his family.  The case has also damaged his extended family, both emotionally and financially.  These are pains, profoundly felt, that Dovi never wants to suffer, or inflict, again. For Dovi, this whole awful ordeal "is something which serves as a constant reminder to do better going forward." (Ex. A-45).

Under the circumstances, there is no reason whatsoever to believe that Dovi will re-offend.  Unsurprisingly, neither the PSR nor the government suggests that he will commit further crimes.  The criminal law has therefore already achieved its deterrence objective.  *See, e.g., United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time . . . constitutes a source of both individual and general deterrence[]"), *aff'd*, 31 F.3d

73 (2d Cir. 1994); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct.").

Those who know Dovi wholeheartedly concur: "We believe that this very public and painful experience has undoubtedly made an indelible lifelong impression on him that goes a long way to accomplishing much of what the judicial system and punishment are designed to accomplish." (Ex. A-136). Moreover, as detailed in the attached letter from the Aleph Institute, Dovi intends to follow a program of counseling guided by Aleph's reentry and rehabilitation plan. (Ex. A-174).

Simply put, Dovi Wisnicki does not present a risk of committing further crimes.

### ii. The Government Has Already Achieved Adequate General Deterrence

Factors discussed above, which address specific deterrence, also address general deterrence. *Gaind*, 829 F. Supp. at 671 ("Others engaged in similar activities or considering engaging in them have doubtless already learned through informal sources that loss of the business entity involved is an obvious consequence of such illegal behavior."). Moreover, the more than 150 letters from members of Dovi's social, professional and community peers in New York and Los Angeles reflect that Dovi's community is well aware that misconduct of this nature carries with it severe penalties and consequences. *See e.g.,* Ex. A-13 (noting that "friend in L.A." knew that Dovi "was under investigation for a crime").

A sentence well below the advisory Guidelines range can achieve the objective of general deterrence. As Judge Garaufis commented in *United States v. Johnson*, "any amount of prison time is a serious amount of prison time[]" and therefore even a lenient sentence, "combined with

the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient . . . to effect general deterrence." *United States v. Johnson*, Case No. 16 Cr. 4571 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (24-month sentence for guidelines range of 87-108 months). *See also United States v. Martoma*, Case No. 12 Cr. 973 (PGG) (S.D.N.Y. Sep. 17, 2014), ECF No. 318 (Hearing Transcript), at 41-43 (nine-year sentence sufficient for insider trading scheme that generated $275 million in profits and $9 million bonus for defendant with Guidelines range of 188 to 235 months).

The fact that Dovi was an attorney at the time of his crimes does not require the Court to depart from this reasoning.  *See United States v. Finkelstein*, Case No. 21 Cr. 217 (PGG) (S.D.N.Y. Aug. 3, 2023), ECF No. 112 (Hearing Transcript), at 48-53 (below-guidelines sentence for disbarred attorney who was an "existential threat to our justice system"); *United States v. Avenatti*, Case No. 19 Cr. 373 (PGG) (S.D.N.Y. July 8, 2021), ECF No. 341 (Hearing Transcript), at 42-44, (sentencing defendant to 30 months' imprisonment and finding guidelines range of 108 to 135 months to be "excessive because such a sentence is not necessary either to deter Mr. Avenatti or those who might be tempted to engage in similar conduct"); *United States v. Scott*, January 25, 2024 Press Release from U.S. Attorney's Office for the Southern District of New York, available at: https://www.justice.gov/usao-sdny/pr/former-law-firm-partner-sentenced-10-years-prison-laundering-400-million-onecoin-fraud (lawyer who laundered $400 million in fraud proceeds and received $50 million in payments sentenced to 10 years in prison despite guidelines range of 600 months).

**D.      Subsection (a)(2)(C)**

Section 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant[.]" Neither the PSR nor the government suggests that Dovi Wisnicki will commit further crimes or that the public needs protection from him.

**E.   Subsection (a)(2)(D)**

Section 3553(a)(2)(D) provides that courts shall consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]"  Dovi needs no further education or training.  He has no history of mental health issues or substance abuse.  He does not need rehabilitation or correctional treatment.

███████████   ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

Dovi respectfully requests that for any custodial sentence, the Court recommend that the Bureau of Prisons designate a facility that is able to provide the medical care that is needed to manage these difficult and painful conditions.

### E.      Subsection (a)(3)

Subsection 3553(a)(3) provides that courts shall consider "the kinds of sentences available[.]"  Here, the PSR and the Plea Agreement set forth in detail the kinds of sentences available in this case.  *See* PSR ¶¶ 140-158.  As urged elsewhere in this memorandum, the Court should impose a most lenient sentence in this case.

The applicable statutes authorize the imposition of a fine, in an amount up to $250,000, on each Count.  The PSR, however, recommends against the imposition of a fine.  *See* ¶ 139 ("it appears that the defendant does not have the ability to pay a fine due to his negative monthly cash flow, and outstanding restitution and forfeiture obligations[]").  Dovi respectfully urges the Court to follow that recommendation and thus to impose no fine.

### G.      Subsection (a)(4)

Section 3553(a)(4)(A) provides that courts shall consider "the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]"  This memorandum discusses

---

[8] ████████████████████████████████████████████████████

████████████████████████████████████████████

the issues arising under the advisory Guidelines, above.  Dovi respectfully directs the Court's attention to that discussion.

### H.    Subsection (a)(5)

Section 3353(a)(5) provides that courts shall consider any "pertinent policy statement . . . issued by the Sentencing Commission[.]"  The Court should therefore consider the "pertinent policy statements" cited and discussed in the Sentencing Guidelines section of this memorandum, set forth above.

### I.    Subsection (a)(6)

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  The JSIN data, discussed below, provides some insight into the issue of sentence disparity.

The PSR recommends a sentence of 78 months.  That recommendation, however, is far too harsh; it is greater than necessary to comply with the purposes of section 3553(a), and it would yield substantial sentencing disparity.  Thus:

JSIN data reflects average and median sentences of 51 months (under the Guidelines calculation in the Plea Agreement) or 63 and 65 months (under the Guidelines calculation in the PSR).  The recommended sentence (78 months) is therefore more than 50 percent higher than the JSIN data shows (under the Plea Agreement) and 20 percent higher than the JSIN data shows (under the PSR).  Those differences are substantial, and they would yield disparities of the kind that Congress directed the courts to avoid.

As discussed above, furthermore, Dovi's status as a lawyer, and his fearful and irrational obstructive conduct, do not warrant additional punishment.  Certainly, those particular factors do

not bridge the sentencing gaps discussed above or warrant a sentence that would yield the disparities discussed above.

One other data point deserves consideration.  JSIN data can be further filtered by each appellate Circuit.[9]  When fraud cases under § 2B1.1 are filtered to the Second Circuit only, and defendants with a Criminal History Category of I who were sentenced within Sentencing Zone D, the data shows that 58.4% of such defendants received a sentence of less than two years, with an average sentence length of 24 months and a median sentence length of 16 months.  Zone D covers a broad range of Guidelines offense levels, both above and below the calculations in the Plea Agreement and the PSR, nevertheless the filtered data provides relevant information that the Court may consider on the issue of unwarranted sentence disparities.

**J.      Subsection (a)(7)**

Section 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."  In the Plea Agreement, Dovi has agreed to an order of restitution in the amount of $18.8 million.

**CONCLUSION**

For the foregoing reasons, Robert "Dovi" Wisnicki respectfully requests that the Court impose a most lenient sentence.

Dated: New York, New York                                  Respectfully submitted,
        February 1, 2024

                                                By:   /s/ Marc L. Mukasey
                                                      Marc L. Mukasey
                                                      Michael F. Westfal

                                                      MUKASEY YOUNG LLP

---

[9] *See* USSC Interactive Data Analyzer, available at: https://ida.ussc.gov/analytics/saw.dll?Dashboard: During the last five fiscal years (FY2018-2022), there were 1,162 cases within the Second Circuit in which defendants whose primary guideline was § 2B1.1 and a Criminal History Category of I were sentenced within Sentencing Zone D.

570 Lexington Avenue, Suite 3500
New York, New York 10022
(212) 466-6400

 /s/ Kenneth A. Caruso
Kenneth A. Caruso

KENNETH CARUSO LAW LLC
15 West 72nd Street
New York, New York 10023
(646) 599-4970

*Attorneys for Defendant Robert Wisnicki*

**CERTIFICATE OF SERVICE**

  I, Marc L. Mukasey, hereby certify that on February 1, 2024, this document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Dated: New York, New York      /s/ Marc L. Mukasey
    February 1, 2024       Marc L. Mukasey